RETAIL CREDIT COMPANY, et al. *v.* COLEMAN, et al.

No. 40146 April 16, 1956 86 So. 2d 666

*Young & Daniel,* Jackson, for appellants.

*H. T. Carter* and *H. K. Van Every,* Columbus, for appellees.

ETHRIDGE, J.

In this workmen's compensation case the question is whether the great weight of the evidence shows that the injury and death of the employee, Leland M. Coleman, arose out of and in the course of his employment. More particularly, the issue is whether there was substantial evidence to support the finding of the attorney-referee and the Workmen's Compensation Commission that Coleman's death did not arise out of and in the course of his employment. The Circuit Court of Attala County reversed the commission and awarded compensation. We affirm that judgment because there is no substantial evidence in the record to support the commission's order denying an award. The appellants are the employer, Retail Credit Company, Inc., and its insurance carrier, and the appellees-claimants are the widow and minor son of the deceased employee.

Coleman, a young man recently out of college, was employed by appellant Retail Credit Company as a field investigator of insurance claims referred to the company by insurance carriers. The company's home office is in Atlanta, Georgia, but its work in Mississippi is directed from its headquarters in Jackson. The state is divided into several districts for field investigation purposes, with a resident field investigator assigned to each district. When a customer of the company desires an investigation to be conducted, the request, on a form provided, is directed to the nearest field investigator, who makes an investigation, obtains the information, and types up a report in duplicate. The original is sent to the company's client and a copy, along with the investigator's expense account, is mailed to the Jackson office.

Coleman was field investigator in the Kosciusko district. The company paid him a monthly salary of $270

plus 8c per mile for the use of his car, when it was used in the company's business. Coleman's territory contained two "legs" or divisions: In the eastern half, there were Louisville, Ackerman, McCool and Ethel; in the western half, Durant, Lexington, Tchula, Cruger and Pickens. Ordinarily Coleman would work one-half of his territory, return to his headquarters in Kosciusko, and the next day type up the reports on those investigations. However, he had a large area of discretion as to his working hours and the methods of conducting his investigations. Durant was in his territory.

On Wednesday, April 28, 1954, Coleman had made some investigations in Durant and perhaps other parts of his western territory, including an investigation of the Clinton D. Love Matter. Love had been shot in an altercation with another man, and apparently some insurer desired to obtain a factual report on the incident. On Thursday, April 29, Coleman was in Kosciusko typing reports on the investigations he had made the previous day. The company's state manager from Jackson, John W. Miller, had lunch with him that day in Kosciusko. Miller testified that Coleman told him that he had been to Durant on Wednesday, that he had finished the western leg of his territory, and that he was typing his work on that day, Thursday.

Miller's visit to Kosciusko is accounted for by the fact that on April 10 Coleman had resigned his job because of ill health. He was afflicted with a kidney disease. Miller accepted Coleman's offer to continue on the job until May 1, and apparently Miller went to Kosciusko on Thursday, April 29, to discuss the situation with Coleman and to decide whether to close up the Kosciusko station. In the meantime, on Wednesday April 28, Coleman's wife and eleven-month old son had moved to Starkville to live with her widowed mother. Coleman planned to join his family in Starkville on Saturday, May 1.

On Friday, April 30, Coleman made some investigations in Louisville in eastern part of his territory, and returned to Kosciusko around four o'clock that afternoon. His wife testified that around 4:00 p. m. he telephoned her in Starkville; that she thought he was in Kosciusko, and he told her he had some more work to finish on claim cases; that he wanted to come to Starkville on Friday night, but because of these unfinished cases he would have to complete them before he could get away. He intended to come to Starkville on May 1. She said that Coleman advised her on the telephone that he had been to Louiville, and he was going to Durant, since he had "some further information he had to get on some claims so he could close out his office."

Ray T. Stennett, Secretary of the Kosciusko Chamber of Commerce, had an office across the hall from Coleman. He stated that around four o'clock Friday afternoon he had a brief conversation with Coleman, who told him that he was leaving town the next day; and that he had some errands to run, some bills to pay, and "he was trying to wind up his work, so he would see me Saturday morning." On previous occasions Coleman told him he had a lot of work which he had to finish up before he left. Coleman did quite a bit of night work.

Mrs. Mary Emily Read, Medical Librarian of the Community Hospital in Durant, testified unequivocally that between four and five o'clock Friday afternoon Coleman came to her office to inquire about Clinton D. Love, who had been in the hospital only as an emergency outpatient for about two hours, until he was sent by ambulance to a hospital in Jackson. She gave him the information available. Mrs. Read said that she remembered very clearly that this was on the afternoon of Friday, April 30, because she had an appointment at a beauty shop in Durant at five o'clock and she was afraid he might cause her to be late for it. She also placed Friday afternoon as the time because of the next morning, Sat-

urday, she was told about the automobile accident the preceding night, and Wigley, the injured occupant of the other car, was a patient at her hospital. The Friday afternoon date of Mrs. Read's appointment at the beauty shop was confirmed by testimony of Mrs. Ashley, operator of the beauty shop, who said her records reflected the appointment at that time. Mrs. Read was positive that Coleman had visited her in her office in Durant on Friday afternoon, April 30, before five o'clock, and her testimony is particularly convincing in that she associated it with other event of that day and the day following. So the evidence places Coleman in Durant on company business Friday afternoon. It is not revealed as to what he did between 5:00 and 9:30 p. m., but presumably he was investigating either the Love or other matters in Durant.

Between 9:30 and 10:00 p. m. that evening Coleman went to the 51 Grill or Club in Durant and ate a sandwich. Mrs. Marie Morgan, who works there, said that Coleman had come in for food once or twice a week over a period of time; that he told her it was his last day to work, "he had come to Durant to finish some kind of business and he was leaving next morning"; and he shook hands with her and told her that he was glad to have met her. Coleman stayed in the Grill until about 12:00 midnight. He ate, visited at a table with two former college classmates, and drank two cans of beer. He left when the place closed up. He got in his car and drove directly upon the highway to Kosciusko. While driving on this direct route back to his home, his car collided with that of another, and he was killed.

Appellants contend that the commission was warranted in disregarding all of this testimony because it is contradicted by an investigation report which Coleman made on the Clinton D. Love matter. The report is dated April 29. It states that the investigation was made on April 28, Wednesday. It narrates what several persons

around Durant had told Coleman about the Love matter. The first part of the report opposite "Report made at" states "Durant, Miss." Its first seven lines recite: "Full time inspector contacted bookkeeper of the Durant Hospital, Mrs. Read. She stated that your claimant was never admitted to the Durant Hospital. He was brought to this hospital and received first aid. He was at this hospital for only about 2 hrs. He had no hospital record here. It is common practice among the hospitals not to admit a patient when he receives first aid only." The report further states: "This inspector has heard about this case a number of times prior to making this report. I have heard the same story from everyone." Appellants argue that this report is consistent only with Coleman's usual practice of typing up reports the day after an investigation was made; that it is undisputed that Coleman was investigating the Love matter in Durant on April 28; that the information the report says he received from Mrs. Read is exactly what she told him, and she saw him only once on the Love matter; and that therefore Mrs. Read was in error when she said that Coleman contacted her on Friday afternoon, April 30. There is no evidence indicating when or where the report was mailed from, whether Kosciusko or Durant, other than the recital on it that it was "made at Durant."

Appellants assert that this report of Coleman on the Love matter constituted substantial evidence to support the finding of the commission that Coleman did not go to Durant on Friday afternoon on company business. The evidence does not show from what town it was mailed. The fact that it is dated April 29 does not constitute direct evidence on the issue of whether Coleman went to Durant that Friday afternoon. It is circumstantial evidence which, if it had been supplemented with other proof, negativing the claim that Coleman had made the Friday trip on Business, might have been sufficient to support the commission's finding. Yet the

fact that the report was dated April 29 is explained in a reasonable manner. All of the affirmative evidence shows that Coleman made the trip to Durant on company business. His wife testified that her husband told her on Friday afternoon that he had to finish some claims, he was going to Durant for that purpose, and he wanted to verify some information he had obtained. Mrs. Read testified positively that Coleman talked to her in her office at the hospital in Durant before five o'clock on Friday. And Mrs. Morgan, working at the 51 Grill, said that Coleman told her that night that he had come to Durant to "finish some kind of business" and was leaving the next morning. The foregoing is the only evidence in the record as to why Coleman was in Durant on the afternoon and night of April 30. He may also have been there on some other investigation for the company in addition to the Love matter. On this the record is silent. At any rate, these three witnesses definitely placed Coleman in Durant on Friday on company business. The fact that the Love report was dated the day before is reasonably explained by Mrs. Coleman's testimony that her husband told her he had to go to Durant to verify some information he had previously obtained. So all of the evidence on the issue of whether Coleman went to Durant on company business supports an affirmative finding on that point. In view of Mrs. Coleman's testimony concerning her husband's statement that he was going to Durant to verify an investigation, the dating of the report on April 29 is explained and rendered consistent with the other evidence. The commission could not disregard the uncontradicted and reasonable testimony of Mrs. Coleman and Mrs. Morgan, or that of Mrs. Read at the hospital. So the uncontradicted evidence shows that Coleman went to Durant on Friday afternoon on company business. There was no substantial evidence to support a finding of the commission to the contrary.

As a field investigator, Coleman was the judge of his working hours. Durant was in his territory and a place where his work would carry him. The traveling itself was a large part of his job. He was an employee who was paid his traveling expenses by the employer. The journey itself was an inherent part of his services. 1 Larson, Workmen's Compensation Law (1952), Sections 16, 16.20, 17.50. As a traveling employee, it was of course necessary for him to stop and eat from time to time, and the initial part of his visit to the 51 Grill was for that purpose, and in the course of his employment. Subsequently, he stayed at the Grill for a personal visit with friends for about two hours. That was a temporary deviation from the business purpose of his trip to Durant. Larson, Sections 19.10-19.63. But when he left the Grill, there was a completed personal errand put behind him. ''A business destination remaining to be reached, you have the clearest kind of coverage'' of the employee on the trip back to his headquarters in Kosciusko. Larson, Section 19.25. In other words, Coleman's personal deviation had been completed, and he had resumed his direct business route in the course of his employment. His death on this route was within the statute. Ibid., Section 19.32 Vestal & Vernon Agency v. Pittman, 70 So. 2d 227, 231 (Miss. 1954); Whittemore Brothers Corporation v. De Grandpre, 202 Miss. 190, 30 So. 2d 896 (1947); Barmore v. Vicksburg S & P R. R. Company, 85 Miss. 426, 38 So. 219 (1904).

■■ ■ Of course the burden of proof was upon the claimants to establish that Coleman's death arose out of and in the course of his employment. In view of the affirmative evidence that Coleman was returning from a business trip, the presumption of coverage which arises when an employee is found dead at a place where his duties required him to be, or where he might properly have been in the performance of his duties, in the absence of evidence that he was not engaged in his mas-

ter's business, stated in Majure v. Alsup & Associates, 216 Miss. 607, 63 So. 2d 113 (1953), does not need to be invoked here. █ But with reference to the burden of proof in compensation cases of this type, the following test quoted with approval in Majure from Sanford v. Clark Motors, 45 So. 2d 185 (Fla. 1950) is an accurate definition: "In proving that an accident took place in the course of one's employment a claimant is not bound by the preponderance of evidence rule or the rule of proof beyond and to the exclusion of a reasonable doubt as in criminal cases. He is required to prove or show a state of facts from which it may be reasonably inferred that the deceased was engaged in the master's business when the accident took place."

 █ In brief, there was no substantial evidence to support the finding of the commission. The great weight of the evidence shows that Coleman went to Durant on company business, and that after his temporary departure from the course of his employment that evening, he returned directly to his business route back to Kosciusko. His death was connected with his employment and is compensable. Hence the judgment of the circuit court awarding compensation is affirmed, and the cause is remanded to the Workmen's Compensation Commission. Our judgment will carry with it the statutory interest on each payment of compensation from its due date, and 5 percent damages on all payments of compensation due on the date of this decision. █ Appellees' attorneys are allowed a total fee for their services in the amount of 33 percent of the award, for all services rendered, computed as set forth in Sunnyland Contracting Co., Inc. v. Davis, 75 So. 2d 638 (Miss. 1954); Railway Express Agency v. Hollingsworth, 75 So. 2d 639 (Miss. 1954); and W. G. Avery Body Company v. Hall, 80 So. 2d 53 (Miss. 1955).

Affirmed and remanded.

*McGehee, C. J.,* and *Roberds, Lee* and *Holmes, JJ.,* concur.