LEE, P.J.,
for the Court.
FACTS AND PROCEDURAL HISTORY
¶ 1. Phillip Shores and his wife, Lynn, were employed by Total Transportation, Inc., of Mississippi (Total) as an over-the-road trucking team. On January 16, 2003, the couple picked up a load in Sunnyside, Washington, and headed towards Jackson, Mississippi, to deliver the load. While on the road, the Shores began having trouble with their truck and located a Petro station in Laramie, Wyoming, to have the truck repaired. Prior to reaching the Pe-tro station, Mrs. Shores dropped Mr. Shores off at a Sinclair Fuel Center because he wanted to get away from the truck and get something to eat. Mr. Shores had received approximately two hours of sleep in the preceding forty-eight hours and had not had anything to eat in almost twenty-four hours. He told her to go back to the Petro station, repair the truck, and then return to get him. Although they did not specifically discuss where to meet after Mrs. Shores dropped him off, Mrs. Shores testified that it was their custom to meet back wherever they separated. Mr. Shores logged off duty and entered the convenience store. Mrs. Shores also testified that they had been arguing and needed some time apart.
¶ 2. Mrs. Shores drove the truck back to the Petro station for the needed repairs. She returned to the Sinclair Fuel Station about an hour and half later around 6 p.m., went into the convenience store, but did not see her husband. The Sinclair fuel center was a U-shaped complex consisting of a convenience store, a motel, a liquor store, and Foster’s Bar. There was no sign on the outside of the complex indicating that there was a bar inside, so Mrs. Shores never looked for her husband there. She did call the motel to see if he was there, but he was not. She proceeded to drive back to the Petro station to see if her *460 husband had possibly received a ride over there. She saw no sign of him there or at a nearby Pilot fuel station. Mrs. Shores returned to the Sinclair station and drove around it several times trying to locate Mr. Shores. Mrs. Shores drove back to the Petro and Pilot stations two times before parking the truck around 10:00 p.m. in the emergency lane on the exit ramp where she originally dropped off Mr. Shores. She had a clear view of the Sinclair Fuel Station from that position. She stayed in the truck throughout the night, but never made contact with her husband. She left Laramie the next day around 6:00 a.m. and headed for Jackson, Mississippi. While waiting for her husband, Mrs. Shores checked to see if he had made an airline or bus reservation and called Total’s dispatcher to see if he had checked in with them. Mrs. Shores testified that, while waiting for Mr. Shores, she thought he might have been angry enough with Total to quit. Mr. Shores had anger management problems and had quit prior trucking jobs after only short employment periods.
¶3. Mr. Shores entered Foster’s Bar around 3:00 p.m. on January 17 and stayed until 2:00 a.m. when the bar closed. During that time Shores ate a meal, consumed several beers, and shot pool with several other patrons. The bartender told the local police that Shores “did buy a large amount of alcohol for himself and others.” According to several witnesses, he appeared intoxicated while at the bar. Electronic records showed that he withdrew almost all of his weekly paycheck of over $400 from an ATM.
¶ 4. In his guilty plea, Christopher Shandy testified to the following. Shandy arrived at the bar around 11:00 p.m. and, at some point, played pool with Mr. Shores. After the bar closed at 2:00 a.m. Shores asked Shandy for a ride to the Petro station. In the parking lot, Shandy pulled a gun on Shores, ordered him to get in .the car, and drove towards the Petro station. Shores offered Shandy all of his money, but Shandy told him to put it back in his wallet. He wanted to drop Shores off a considerable distance away from the Petro station in order to have plenty of time to flee the scene before Shores could call the police. Shores became nervous when they passed the Petro station and attempted to jump from the moving vehicle. Shandy shot him in the back as he exited the vehicle. Shores bled to death after jumping a fence and landing in a ditch a few hundred feet from the Petro station. Shores’s autopsy revealed that his blood alcohol content was 0.137 grams per deciliter. He had $170 in his wallet and less than $20 in his pocket.
¶ 5. Mrs. Shores filed suit against Total and its insurance carrier, seeking workers’ compensation benefits for the death of her husband. On September 7, 2004, the Administrative Law Judge entered an order awarding death benefits to Mrs. Shores. Total appealed the ALJ’s ruling to the Commission, which affirmed without comment. Upon judicial review, the Circuit Court of Rankin County affirmed the decision of the Commission. Total perfected its appeal to this Court raising the following issues: (1) whether the Commission erred in holding that Mr. Shores was acting in the course and scope of his employment when he was killed; and (2) whether the Commission erred in holding that the third party assault on Mr. Shores was directed against him because of his employment. We find reversible error in regards to both issues.
STANDARD OF REVIEW
¶ 6. The standard of review in workers’ compensation cases is well established. A decision of the Commission will be reversed only if it is not supported by *461 substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778(6) (Miss. 2003) (citing Smith v. Jackson Constr. Co., 607 So.2d 1119, 1124 (Miss.1992)). If the Commission’s decision and findings of fact are supported by substantial evidence, then we are bound by them even if we as fact finder would have been convinced otherwise. Spann v. Wal-Mart Stores, 700 So.2d 308, 311(12) (Miss.1997) (citing Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). We will exercise de novo review on matters of law. KLLM, Inc. v. Fowler, 589 So.2d 670, 675 (Miss. 1991).
DISCUSSION
I. DID THE COMMISSION ERR IN HOLDING THAT MR. SHORES WAS ACTING IN THE COURSE AND SCOPE OF HIS EMPLOYMENT WHEN HE WAS KILLED?
¶ 7. In its first issue on appeal, Total argues that the Commission erred in holding that Mr. Shores was acting in the course and scope of his employment when he was killed. Mississippi’s workers’ compensation statutes compensate injuries “arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.” Miss.Code Ann. § 71-3-3(b) (Rev.2000). The term “arising out of employment” simply means there is a causal connection between the employment and the injury. Singley v. Smith, 844 So.2d 448, 453(¶ 20) (Miss.2003). One is injured in the course of employment when an injury results from activity actuated partly by a duty to serve the employer or reasonably incident to the employment. Id.
¶ 8. If the employee is considered a traveling employee, the employee remains in the course of his employment from the time he leaves home until he returns unless the employee deviates from his employment. Bryan Bros. Packing Co. v. Dependents of Murrah, 234 Miss. 494, 500, 106 So.2d 675, 677 (1958). If the traveling employee is on a “personal mission or errand of his own” then he will not be compensated for his injuries. Id. Furthermore, in order to find a death or injury noncompensable on the ground that an employee deviated from his duties, the testimony must be sufficient to constitute an abandonment. Estate of Brown by Brown v. Pearl River Valley Opportunity, 627 So.2d 308, 311 (Miss.1993); Webb v. Hunter, 431 So.2d 1131, 1133 (Miss.1983). A mere deviation or departure by an employee from employment duties does not in and of itself constitute such a departure as to relieve an employer from liability for the employee’s act on the ground that the employee has deviated from his service. Brown, 627 So.2d at 311. However, the supreme court has also held that unsanctioned recreational activities wholly unrelated to employment duties do not arise out of and in the course of employment. Id. at 313; Collier v. Texas Constr. Co., 228 Miss. 824, 828, 89 So.2d 855, 857-58 (1956).
¶ 9. Mr. Shores entered the bar around 3:00 p.m. and stayed there for over ten hours. Although he did eat, Mr. Shores stayed at the bar in order to drink and play pool. He withdrew his weekly paycheck of over $400, which Mrs. Shores usually put into a joint bank account, to buy drinks for himself and other patrons. According to the deposition of John Bee-ston, a deputy with the local sheriffs department in Laramie, two witnesses described Mr. Shores as intoxicated that evening. Furthermore, Mrs. Shores was worried that he may have quit since his *462 employment history in previous years was spotty at best. Mrs. Shores testified that they had worked for six trucking companies from October 2000 until they began working for Total in mid-2002. The reasons for termination from these prior trucking jobs all stemmed from Mr. Shores’s temper, including threatening his employer, threatening to wreck his truck, abandoning his truck, and throwing a rock at his truck and breaking the windshield. Prior to exiting the truck, Mr. Shores was angry with his wife and with Total because of problems and delays in repairing the truck.
¶ 10. The Commission, in adopting the ALJ’s ruling, erred in only considering Mr. Shores’s intoxication within the context of Mississippi Code Annotated Section 71—3—7(d) (Rev.2000), which states that “[n]o compensation shall be payable if the intoxication of the employee was the proximate cause .of the injury....” Total did not use Mr. Shores’s intoxication as an affirmative defense, but instead argued that Shores’s intoxication bolstered the showing of deviation from the course of employment. See Arthur Larson, 1 Larson’s Workers’ Compensation Law § 17.06[1] (2006) (drinking is one component in establishing deviation from course of employment but, if used as affirmative defense, must be strictly proven). The Commission also erred in finding that Mr. Shores’s noncompliance with company policy regarding drinking alcohol-while on the job did not preclude him from reentering his employment. Total’s company policy clearly stated that drivers are prohibited from consuming alcohol while on duty and for a period of four hours before going on duty. United States Department of Transportation regulations state that an employee cannot report for duty while having an alcohol concentration of 0.04 or greater. We fail to see how someone clearly intoxicated throughout the course of the evening could reenter the course and scope of his employment if doing so would violate company policy and Department of Transportation regulations.
¶ 11. The Commission found this case to be analogous to Retail Credit Co. v. Coleman, 227 Miss. 791, 86 So.2d 666 (1956). In Retail Credit, Coleman was a traveling employee who stopped for dinner and had two beers while visiting with friends between 9:30 p.m. and midnight. While driving back to his headquarters Coleman was killed in a car accident. The supreme' court, upholding the award of compensation, found that Coleman had completed his temporary personal errand and resumed his direct business route. Id. at 800, 86 So.2d at 670. We find the facts in Retail Credit clearly distinguishable from the case sub judice for many reasons, most of which have been discussed supra. Coleman was in his company car and had resumed his business route when the accident occurred. Mr. Shores was not on a temporary personal errand and the facts sub judice cannot be stretched to find such.
¶ 12. We cannot find that the intent of our workers’ compensation laws is to sanction such behavior as Mr. Shores exhibited. Mrs. Shores stated that her husband was stranded and had no choice but to wait at the bar. We are unpersuaded by that statement as Mr. Shores chose to drink large amounts of alcohol and only left the bar because it was closing. The fact that Mr. Shores remained at the bar for eleven hours, his drinking, his state of mind prior to leaving the truck and even prior employment history clearly indicate that Mr. Shores was not acting reasonably incident to employment. This was no mere dinner break.
*463 II. DID THE COMMISSION ERR IN HOLDING THAT THE THIRD PARTY ASSAULT ON MR. SHORES WAS DIRECTED AGAINST HIM BECAUSE OF HIS EMPLOYMENT?
¶ 13. If an employee’s injury or death has been caused by a third party intentional tort, it must be shown that such willful act was directed against the employee “because of his employment while so employed and working on the job.... ” Miss.Code Ann. § 71-3-3(b) (Rev.2000) (emphasis added). “The words ‘because of,’ like other broadly-construed words of causation with the act, such as ‘arising out of,’ express the necessity of a nexus between the injury and employment.” Big “2” Engine Rebuilders v. Freeman, 379 So.2d 888, 890-91 (Miss.1980). “The base line is simply a rational connection of employment and injury.” Id. at 891. The employment and injury must be connected in “some more direct manner than the mere furnishing of an opportunity” to the third party to commit the assault. Brookhaven Steam Laundry v. Watts, 214 Miss. 569, 635, 59 So.2d 294, 299 (1952). The employment must be a “contributing cause” of the willful act of the third party, not merely a “contributing cause” of the employee being present at the place where the assault occurred. Id.
¶ 14. In Watts the court held that an employee injured by a third party for personal reasons was not injured because of his employment. Id. at 635, 59 So.2d at 304. Watts, a route man for Brookhaven Steam Laundry, began an affair with a married woman named Mrs. Garrett. One day Watts came to the Garrett’s residence to see Mrs. Garrett and pick up the Garrett’s laundry and dry cleaning. After talking for several minutes without realizing that Mr. Garrett was at home, Mr. Garrett suddenly appeared with a pistol in his hand and told Watts to leave. When Watts refused, Mr. Garrett shot him and Watts later died. In analyzing whether Watts was killed because of his employment, the court stated the following:
There is no direct testimony in the record to show that Watts’ employment was in any manner a contributing cause to his injury. He did not become involved in a quarrel with Garrett over the receipt or delivery of laundry, or the collection of a laundry bill, or because of any dissatisfaction with the service rendered by the Brookhaven Steam Laundry, or by Watts as its employee. Garrett and Watts had had no sharp words concerning the quality of service that Watts had rendered in the handling of the laundry for Garrett and his family. So far as this record shows Garrett killed Watts because Garrett believed that Watts was having improper relations with his wife. The fact that Watts was an employee of the Brookhaven Steam Laundry was a contributing cause of Watts’ being at the Garrett home that day, but it was in no sense a contributing cause of the willful shooting of Watts by Garrett.
Id. at 635, 59 So.2d at 299.
¶ 15. Similarly, Shores did not become involved in an altercation with Shandy over Shores’s trucking services or anything related to trucking. While Shores’s employment with Total was a contributing cause of his being in Shandy’s car when he was shot, his employment as a truck driver was not in any way a contributing cause of Shandy’s decision to rob and then fatally shoot him. Most likely, Shandy would have robbed and shot Shores regardless of the nature of his employment, as Shores had several hundred dollars, was heavily intoxicated, and needed a ride to his truck. If Shores had not asked Shandy for a ride, then he possibly would *464 not have been robbed and eventually shot, and if he had not been employed as a trucker he would not have needed a ride. In that narrow sense his death was employment-related. However, the fact that his job as a trucker caused him to be in Shandy’s car is insufficient to establish a nexus between employment and injury. In order to satisfy the “because of’ requirement, the employment must have a causal relationship with the willful assault of the third party. In this case there clearly is no causal relationship.
¶ 16. However, the ALJ’s reasoning, which was adopted by the Commission, in this case was formed by a different legal theory. The judge invoked the “positional risk doctrine” and held that Shores was killed because of his employment based on “the fact that the risk of assault was a street risk which was incidental to his employment as a traveling employee far away from home.” The “positional risk doctrine” was defined in Johnson v. Roundtree, 406 So.2d 810 (Miss.1981), as follows:
Since every jurisdiction now accepts, at the minimum, the principle that a harm is compensable if its risk is increased by the employment, the clearest ground of compensability in the assault category is a showing that the particular character of claimant’s job or because of the special liability to assault associated with the environment in which he must work. Among the particular jobs that have, for self-evident reasons, been held to subject an employee to a special risk of assault are ... those jobs that specially expose the employee to lawless or irresponsible members of the public, ... or that merely subject the employee to increased and indiscriminate contact with the public, such as the jobs of streetcar conductor, bus driver, taxi driver or hotel manager.
Roundtree, 406 So.2d at 811 n. 1 (quoting 1 Larson’s Workmen’s Compensation Law, § 11.11(a) (1978)).
¶ 17. In Johnson, the supreme court held that the death of Roundtree, a taxicab driver who was shot in the head while picking up a fare, was compensable. Id. The court found a rational connection between Roundtree’s employment and his death based on the positional risk doctrine:
Roundtree was exposed to the hazard of robbery or assault because of the nature of his employment; and ... his death would not have occurred except for the fact that his employment conditions placed Roundtree in the position where he was injured by a force neither personal to him nor associated with his employment.
Id. at 810-11.
¶ 18. A few other Mississippi cases have employed a rule similar to the “positional risk doctrine” in cases involving third party intentional torts. The general rule is that in determining whether an employee is injured because of his employment “[a]ll that is required is that the ‘obligations or conditions’ of employment create a ‘zone of special danger’ out of which the injury arose.” Williams v. Munford, Inc., 683 F.2d 938, 939 (5th Cir. 1982).[1] Put another way, an employee is injured because of his employment if the “injury arose as a result of a risk created by employment conditions.” Id.
¶ 19. In Williams the Fifth Circuit held that a convenience store clerk who was *465 raped during a store robbery could not sue her employer in tort and could only sue under the Mississippi Workers’ Compensation Act. Id. at 940. The eighteen year old clerk worked at a convenience store that had been frequently robbed and continued to lack security devices and security guards. The clerk did not have a key to lock the doors and was not allowed to keep a firearm. The court found that the store was a “zone of risks” and the rape came about as a result of conditions created by the employer. Id.
¶ 20. This Court applied the aforementioned rule in Green v. Glen Oaks Nursing Ctr., 722 So.2d 147 (Miss.Ct.App.1998). Green was a nurse who worked the night shift from 11:00 p.m. to 7:00 a.m. at the Glen Oaks Nursing Center. She was forced to park in a secluded parking lot without security guards and one night she was assaulted and robbed in the parking lot by an unknown assailant. This Court held that “the injury to Green arose as a result of a risk created by employment conditions.” Id. at 150(12). In a similar case, Adams v. Lemuria, Inc., 738 So.2d 295 (Miss.Ct.App.1999), this Court held that the injuries sustained by an employee, who was injured when she jumped from her car after being abducted in the parking lot of her employer, arose as a result of a risk created by employment conditions. Id. at 298(11).
¶21. However,, in Sanderson Farms, Inc. v. Jackson, 911 So.2d 985 (Miss.Ct. App.2005), Jackson was hit over the head at work with a two-by-four by a co-worker from whom he had demanded repayment of a ten dollar loan. This Court held that the Sanderson Farms chicken plant was not a “zone of danger” and that “the risk to Jackson in this case arose solely from his personal disagreement with Allen concerning the ten dollar loan.” Id. at 991(16).
¶ 22. In the instant case, the issue to be decided is whether the employment conditions of truck drivers subject them to a special risk of assault. Other states have held that the “positional risk doctrine” or “street risk doctrine” applies directly to truck drivers. Special Fund of Industr. Comm’n v. Catalina Trucking Co., 134 Ariz. 585, 658 P.2d 238, 241 (Ariz.Ct.App. 1982) (holding that the risk of assault is inherent to a truck driver’s employment environment); Hudson v. Thurston Motor Lines, Inc., 583 S.W.2d 597, 602 (Tenn. 1979) (holding that truck drivers are exposed to the risk of assault and highway robbery to a much greater extent than the general public). However, the Supreme Court of Virginia, which employs the “actual risk” test, has held that truck drivers are not exposed to the risk of being robbed and assaulted to a greater degree than the general public. Hill City Trucking, Inc. v. Christian, 385 S.E.2d 377, 380 (1989).
¶ 23. Truck stops are viewed by some as dangerous places, but there is no evidence, and the appellee does not suggest, that a person is more likely to be robbed and assaulted at a truck stop than any other public place where large numbers of people interact. Of course, Shores’s employment did not require him to be in Foster’s Bar at 2:00 a.m. His employment required him to visit truck stops, not the bars located in or near truck stops. This Court will not apply the positional risk doctrine to truck drivers based on unfair stereotypes of them and generalizations about the environment in which they work.
CONCLUSION
¶ 24. In reversing the Commission’s decision, we are mindful that the Mississippi Workers’ Compensation Act should be given a liberal interpretation in order to effect its humanitarian aims. *466 ABC Mfg. Corp. v. Doyle, 749 So.2d 43, 47(17) (Miss.1999). However, “it is the duty of the court to construe the Act as it is written.” Watts, 214 Miss, at 633, 59 So.2d at 298. The-court in Big “2” Engine stated that “no public policy would be served by compensating an injury or death originating with the employee’s personal indiscretions, whether real or fancied. Risks associated with such escapades cannot reasonably be viewed as risks associated with employment.” Big “2” Engine, 379 So.2d at 891. Shores’s death did not originate with his personal indiscretions, but the extended escapade he went on at Foster’s Bar exposed him to risks that cannot reasonably be viewed as being associated with the trucking business or arising out of or in the course of his employment. To grant compensation in this case would be contrary to public policy and would effectively erase the “because of his employment” requirement from the Mississippi Workers’ Compensation Act.
¶ 25. For the above reasons, we find the Commission improperly applied the law in holding that Mr. Shores’s death was compensable under the law. Therefore, we reverse.
¶ 26. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
MYERS, P.J., GRIFFIS, BARNES, ISHEE and ROBERTS, JJ., CONCUR.
CHANDLER, J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY KING, C.J., SOUTHWICK AND IRVING, JJ.

. This is a quote from the original opinion of Brookhaven Steam Laundry v. Watts, which was withdrawn after the appellants filed a suggestion of error. Brookhaven Steam Laundry v. Watts, 214 Miss. 569, 55 So.2d 381 (1951), withdrawn by Brookhaven Steam Laundry v. Watts, 214 Miss. 569, 59 So.2d 294 (1952).