CHANDLER, J.,
DISSENTING.
¶ 27. I respectfully dissent. In my opinion, the order of the Workers’ Compensation Commission affirming the decision of the administrative law judge correctly applied the law and was supported by substantial evidence. Therefore, I would affirm the decision of the circuit court affirming the Commission’s award of death benefits to Gerry Lynn Shores. As explained below, I believe the majority impermissibly substitutes its judgment for that of the Commission and misapplies the law governing whether Phillip Shores’s death arose out of and in the course of his employment.
¶28. This Court’s review of the decisions of the Workers’ Compensation Commission is limited and deferential. Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778(¶ 6) (Miss.2003). We may reverse the Commission only if its decision was unsupported by substantial evidence, was arbitrary and capricious, or involved an erroneous application of the law. Id. While our review of questions of law is de novo, we are prohibited from retrying de novo matters on appeal from the Commission. Ricks v. Miss. State Dep’t of Health, 719 So.2d 173, 177(¶ 10) (Miss.1998). Rather, our review of the evidence before the Commission is limited to determining whether there was evidence substantially supporting the Commission’s decision such that its decision was not arbitrary and capricious. Weatherspoon, 853 So.2d at 778(¶ 6). “Substantial evidence” has been defined as “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion” and affords “a substantial basis of fact from which the fact in issue can be reasonably inferred.” Cent. Elec. Power Ass’n v. Hicks, 236 Miss. 378, 389, 110 So.2d 351, 357 (1959). If substantial evidence supports the Commission’s decision, this Court may not reverse even if, acting as the fact-finder, we would have reached the opposite conclusion. Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994). To do *467 otherwise constitutes an impermissible intrusion by this Court into the field of the Commission. Miss. State Tax Comm’n v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss.1969).
¶ 29. The sole issue before the Commission was whether Shores’s death met the definition of a compensable injury under Mississippi Code Annotated section 71-3-3(b) (Rev.2000), which provides in pertinent part:
“Injury” means accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.... This definition ... also includes an injury caused by the willful act of a third person directed against an employee because of his employment while so employed and working on the job,....
The court discussed this language in Big “2” Engine Rebuilders v. Freeman, 379 So.2d 888 (Miss.1980). The phrase “arising out of’ demands some causal connection between the injury and the employment. Id. at 890. “Reasonable relation of employment and injury may involve minimal causation, less than needed for liability in the field of Torts.” Id. For an injury to arise out of the employment, the employment need not be the sole cause of the injury; it is sufficient if the employment rationally contributes to it. Id.
¶ 30. The phrase “in the course of’ “is satisfied whenever the injury resulted from activity which is (1) in its overall contours actuated at least in part by a duty to serve the employer, or (2) reasonably incidental to the employment.” Id. This includes some personal pursuits incidental to the employment such as using the telephone and purchasing soft drinks. Id. It has also been stated that a compen-sable injury is one that arises within the time and space limits of the employment and also while the employee is engaged in an activity related to the employment, that is, when the employee is carrying out the employer’s purposes directly or indirectly. Bivens v. Marshall R. Young Drilling Co., 251 Miss. 261, 274, 169 So.2d 446, 451 (1964).
¶ 31. A special rule applies to traveling employees such as Shores. A traveling employee remains in the course of employment from the time he leaves home on a business trip until he returns and the employment covers both the time and the place of travel, except in deviation cases or when the employee is on a personal mission or personal errand. Bryan Bros. Packing Co. v. Dependents of Murrah, 234 Miss. 494, 500, 106 So.2d 675, 677 (1958). To constitute a deviation, the employee’s personal activity must equate to an abandonment. Estate of Brown ex rel. Brown v. Pearl River Valley Opportunity, Inc., 627 So.2d 308, 311 (Miss.1993). The “mere deviation or departure by a servant from a strict course of duty, does not in and of itself constitute such a departure from the master’s business as to relieve a master from liability for the servant’s act on the ground that the servant has deviated from his service.” Id. Thus, for example, a traveling employee remains in the course of employment during breaks to stop and eat, such activity being reasonably incidental to employment as a traveling employee. Retail Credit Co. v. Coleman, 227 Miss. 791, 799, 86 So.2d 666, 669 (Miss.1956).
¶ 32. The claimant bears the burden of proof of a compensable injury. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994). The Commission, by affirming the opinion of the administrative law judge, found that Lynn had sustained her burden of proof that Shores’s death arose out of and in the course and scope of his *468 employment. As discussed below, I would find that the Commission’s decision was supported by substantial evidence and that the Commission properly applied the law.
¶ 33. The Commission approached the question of whether Shores’s death occurred in the course of his employment chronologically by examining Shores’s activities on the afternoon of January 17, 2003 and in the early morning of January 18, 2003. The undisputed evidence before the Commission showed that, on the afternoon of Friday, January 17, 2003, Lynn let Shores out of the truck at the Sinclair Truck stop in Laramie, Wyoming. The Sinclair Truck Stop was located off Interstate 80 at exit 310. Lynn watched Shores approach the door of the truck stop. Then, Lynn drove the truck to the Petro station located at nearby exit 311 to procure a new fuel filter. The Shores’s pay was deposited into an account every Friday. After Lynn dropped Shores off, he withdrew cash in the amount of his weekly paycheck from the account.
¶ 34. Before the Commission, Total argued that Shores’s departure from the truck constituted an abandonment of his employment sufficient to remove him from the course of his employment for the purposes of section 71 — 3—39(b). Total argued that the manner in which Shores left the truck constituted an abandonment of the truck, known in the industry as “jumping truck,” and a terminable offense. Total contended that it required its truckers to inform the dispatcher if the trucker was going off-duty for any period of time over an hour, and that Shores had failed to contact the dispatcher before leaving. Total further argued that Shores’s drinking at Foster’s Restaurant violated company policy and was a terminable offense. Total . contended that the weight of the evidence showed that, when Shores left the truck on the afternoon of January 17, 2003, Shores intended to resign his employment by abandoning the truck and going on a drinking binge.
¶ 35. The Commission found from the preponderance of the evidence that Shores’s departure from the truck was not a severance of his employment with Total and did not remove Shores from the course of his employment. This finding was supported by substantial evidence, including the following, most of which was cited by the Commission in support of its finding. Lynn testified that Shores left the truck intending to get something to eat and to take a break, not to abandon the truck or his employment. Lynn further testified that Shores had not eaten since the day before. Undigested food particles were found in Shores’s stomach at the autopsy, indicating Shores indeed had eaten after exiting the truck. Lynn testified that Shores logged off duty before leaving the truck and asked her if she could handle the fuel filter repair. Both Lynn and another Total driver, Bonnie Faulkner, testified that it was not their regular practice to notify dispatch before going off-duty; rather, they would call dispatch when they picked up or dropped off a load or were having problems with the truck.
¶ 36. Lynn testified that she and Shores had been arguing that day due to the fuel filter problem and that they needed some time apart. The existence of the fuel filter problem was supported by the slow speed of the truck on its approach to Laramie as indicated by the global positioning system. Omar Hadi, the dispatcher, testified that, when Lynn told him she could not find Shores, he thought Shores would return to the truck and had no concerns that Shores would not deliver the load. At that time, Hadi did not tell Lynn that Shores’s actions violated company policy or constituted a terminable offense. Further, Shores never told Lynn or any *469 one else that he was abandoning the truck or his employment with Total. The Commission found that Shores’s withdrawal of his paycheck from the ATM machine did not evince a resignation or intent to resign.
¶ 37. The Commission found that the idea that Shores intended to abandon the truck was inconsistent with the fact that he asked his co-driver, Lynn, to handle the truck repairs when he logged off and left the truck, and that Shores left Lynn in charge of the load when he went off-duty. The Commission further observed that the idea that Shores abandoned the truck was inconsistent with his telling the patrons of Foster’s Restaurant that he was a truck driver and asking for a ride back to the truck upon leaving Foster’s. The Commission recognized Total’s argument that Shores’s intent to abandon his employment could be inferred from the fact that he remained in Foster’s Restaurant for eleven to twelve hours. The Commission rejected this argument, observing that, as a long-haul truck driver away from home with no transportation and no cell phone, logically Shores would not have left the fuel center complex where Lynn left him. The Commission found that Shores remained where his co-driver had left him and where she expected to pick him up. After noting that there would be no way for Shores to have known Lynn would not be able to find him, the Commission stated,
Obviously, if Decedent did not think that his co-driver and wife would not be able to find him where she had left him, he would not have thought that he would be away from the truck for eleven or twelve hours or, thereby, needed dispatch approval to be off duty for eleven or twelve hours.
¶ 38. The Commission’s conclusion that Shores remained in the course of his employment at the time that he left the truck primarily turned on Shores’s intent. If Shores intended to resign his employment when he left the truck, his departure could have been a deviation amounting to an abandonment of employment. But, if Shores left the truck for the purposes of obtaining food or rest, activities incidental to employment, then Shores remained in the course of employment. The matter of Shores’s intent, whether to resign from his employment with Total and to go on a drinking binge of to obtain rest and food, presented a question of fact. I believe that the evidence recited above was adequate to substantially support the Commission’s finding that Shores did not resign his employment and depart from the course of employment when Lynn dropped him off at the Sinclair Fuel Center.
¶ 39. Without discussing the Commission’s findings, the majority appears to agree with Total’s assertion that Shores left the truck with the intent to abandon his employment. Certainly, as noted by the majority, Shores had a spotty employment record. He had been fired from several trucking jobs. Several witnesses attested to his bad temper. While Lynn did testify that, when she was unable to find Shores she worried that he had quit, she said that this fear was one of several that she developed in bewilderment over having lost contact with Shores, including fears that Shores had been kidnaped or hospitalized, or had checked into a motel for the night. This evidence that Shores had abandoned his employment at the time that he left the truck is far too speculative to enable our reversal of the Commission’s contrary finding.
¶40. The Commission further found that Shores entered Foster’s Restaurant, which served both food and alcohol, with the intent to obtain something to eat. This finding was supported by substantial evidence. In addition to the evidence cited above concerning Shores’s intent to get *470 something to eat when he left the truck, Lynn testified that the Sinclair Fuel Center served only pre-packaged cold sandwiches and that Shores was afraid to eat pre-packaged cold sandwiches due to the risk of food poisoning. Lynn stated that, when she was looking for Shores at the Sinclair on the evening of January 17, 2003, and discovered that the Sinclair only had cold sandwiches, Lynn reasoned that Shores had gone elsewhere for food.
■¶41. Next, the Commission found that Shores deviated from his employment “when he elected to drink alcohol, become intoxicated, play pool and otherwise engage in personal activities unrelated to his employment.” Rejecting Lynn’s argument that her inability to locate Shores had created an enforced lull in his work, the Commission found that Shores’s “decision to drink alcohol and pursue a frolic of his own established a distinct, personal deviation from the direct or incidental activities of Lis employment.” The Commission found that there would have been no deviation from the course of Shores’s employment had he remained at Foster’s Restaurant for eleven or twelve hours but refrained from drinking alcohol while awaiting his co-driver’s return. The Commission’s conclusion that Shores deviated from his employment while drinking at Foster’s Restaurant is not challenged on appeal, and I do not address it.
¶ 42. I next discuss the Commission’s finding that, because Shores’s deviation from employment ended when he asked Shandy for a ride back to his truck, his death was in the course of his employment. That'finding was based upon Coleman, 227 Miss, at 799, 86 So.2d at 669, in which a traveling employee was found to have temporarily abandoned his employment by remaining at a restaurant after eating in order to drink alcohol and socialize. The court held that Coleman had resumed his employment when he left the restaurant and continued driving on his route. Id. The majority distinguishes Coleman, holding that, as a matter of law, Shores could have not resumed his employment due to his intoxication. The majority states:
The - Commission also erred in finding that Mr. Shores’s noncompliance with company policy regarding drinking alcohol while on the job did not preclude him from reentering his employment. Total’s company policy clearly stated that drivers are prohibited from consuming alcohol while on duty and for a period of four hours before going on duty while having an alcohol concentration of .04 or greater. We fail to see how someone clearly intoxicated throughout the course of the evening could reenter the course and scope of his employment if doing so would violate company policy and Department of Transportation regulations.
Later, in- the majority’s holding that Shores’s death did not arise out of his employment, the majority states that Shores’s “job as a trucker caused him to be in Shandy’s car,” that, if Shores “had not been employed as a trucker he would not have needed a ride,” and that “Shores’s employment with Total was a contributing cause of his being in Shandy’s car when he was shot.” The implication of this reasoning by the majority is that, although Shores’s securing of a ride back to the truck was reasonably incidental to his employment as a trucker, Shores’s intoxication was a violation of company policy that prevented his death from occurring in the course of employment.
¶ 43. I begin by addressing the majority’s holding that, because Shores was intoxicated and legally could not have gone on duty at the moment Shandy would have dropped him at the truck, his murder by Shandy on the ride back to the truck was *471 not in the course of his employment. This holding erroneously equates on duty status under Total policies and Department of Transportation (DOT) regulations with being in the course of employment under section 71-3-3(b). As the Commission correctly recognized, “neither company policy nor DOT regulations govern whether the death of an employee arises out of and in the course of employment within the meaning of Miss.Code Ann. Section 71—3—7(b) (Rev.2000).” Under our Workers’ Compensation scheme, a traveling employee remains in the course of employment from the time he leaves home until the time he returns home, absent a deviation equivalent to an abandonment of employment. Bryan Bros., 234 Miss. at 500, 106 So.2d at 677. This is because almost all of the traveling employee’s activities away from home, even rest and recreation, are within the time and space limitations of the employment and reasonably incidental to being a traveling employee. Certainly, time spent for personal rest and recreation is reasonably incidental to employment as a long-haul truck driver, especially since DOT regulations mandate that drivers rest between periods of time spent driving, and place daily and weekly limits on the amount of time a driver can be on duty. Thus, whether Shores was on or off duty, when he was away from home he was within the course of his employment as a long haul truck driver unless he deviated from his employment to a degree coextensive with an abandonment of his employment.
¶ 44. I next address the effect of Shores’s intoxication on his ability to resume his employment for workers’ compensation purposes. The Commission found that Shores’s intoxication when he left Foster’s violated company policy and/or DOT regulations but that his intoxication did not bar him from resuming his employment. In fact, testimony from Total employees, regulations promulgated by the DOT, and Total’s written employee policies raised a question as to whether Shores’s intoxication violated company policy. Bill Robertson, Total’s former director of safety and human resources, testified that, according to DOT regulations, a driver could not consume alcohol when performing any duty for the company or for four hours before performing any duty for the company. Lynda Lee Lollar, Total’s night dispatcher, testified that a driver violated Total’s policies by consuming alcohol while “on duty” or “running a load.” Lollar testified that she interpreted the policy as barring any use of alcohol while on dispatch. She stated that a driver would not violate Total’s policies by drinking alcohol while off duty. Lynn testified that no one at Total had instructed drivers not to drink alcohol while off duty and that Total tolerated other truck drivers drinking alcohol while off duty.
¶ 45. According to Total’s written policies, “on duty” means the driver is engaged in safety-sensitive functions as defined by DOT regulations. DOT regulations provide that:
safety, sensitive functions shall include:
(1) All time at an employer or shipper plant, terminal, facility or other property, or on any public property, waiting to be dispatched, unless the driver has been relieved from duty by the employer;
(2) All time inspecting equipment as required by §§ 392.7 and 392.8 of this subchapter or otherwise inspecting, servicing, or conditioning any commercial motor vehicle at any time;
(3) All time spent at the driving controls of a commercial motor vehicle in operation;
*472 (4) All time, other than driving time, in or upon any commercial motor vehicle except time spent resting in a sleeper berth (a berth conforming to the requirements of § 393.76 of this subchap-ter);
(5) All time loading or unloading a vehicle, supervising, or assisting in the loading or unloading, attending a vehicle being loaded or unloaded, remaining in readiness to operate the vehicle, or in giving or receiving receipts for shipments loaded or unloaded; and
(6) all time repairing, obtaining assistance, or remaining in attendance upon a disabled vehicle.
¶ 46. Total’s alcohol policies mirror DOT regulations and provide that drivers are prohibited from consuming alcohol while on duty performing safety-sensitive functions and for a period of four hours before going on duty, and that an employee cannot report for duty with a blood alcohol concentration of .04 percent or greater. Also, alcohol is not allowed inside the truck. The punishment for an employee’s violation of these policies is mandatory termination. According DOT regulations, a driver is off duty when occupying the sleeper berth of the truck. It appears that a driver could log off duty, drink alcohol outside the truck, and then remain outside the truck or occupy the sleeper berth of the. truck without running afoul of Total policies or DOT regulations provided the driver did not return to duty for four hours or until his blood alcohol level was below .04 percent. There was no evidence that Shores intended to return to on-duty status when he returned to the truck. Therefore, it is questionable whether Shores violated Total’s alcohol policies or DOT regulations by logging off duty, becoming intoxicated, and attempting to return to the truck.
¶ 47. Even if Shores’s intoxication did violate Total policies and/or DOT regulations, as the Commission recognized, Shores’s intoxication in violation of company policy or federal regulations could not bar compensability of his injury under Mississippi Code Annotated section 71-3-7. Section 71-3-7 states that compensation is payable “without regard to fault as to the cause of the injury....” Subsection (b) provides that compensation is not payable if the employee’s intoxication was the proximate cause of the injury. The Commission found that Shores’s intoxication did not proximately 'cause his murder by Shandy and, therefore, his intoxication did not render his death non-compensable.
¶ 48. In Tyson Foods, Inc. v. Hilliard, 772 So.2d 1103, 1105 (¶¶ 8-9) (Miss.Ct.App. 2000), this Court addressed the effect of Hilliard’s possible intoxication at the time of his injury upon the compensability of his injury, which was otherwise work-related. At the emergency room immediately after the injury, Hilliard refused to submit to an employer-mandated drug test. Id. at 1104(¶ 3). The employer terminated Hilli-ard for violating the company’s post-accident drug testing policy. Id. at 1105(¶ 4). The employer argued that Hilliard’s injury was not compensable because of Hilliard’s post-injury misconduct. Id. at 1105(¶ 8). While there was no showing that intoxication proximately caused Hilliard’s injury, Hilliard’s failure to submit to a drug test implied that he was impaired at the time of the injury in violation of the employer’s drug policies. We affirmed the Commission’s finding that the injury was compen-sable, stating:
The relevant statute stated that “compensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease.” Miss.
*473 Code Ann. § 71-3-7 (Rev.2000). Regardless of whether Hilliard had been slightly or egregiously careless, or whether his own, a fellow employee, or a supervisor’s negligence caused the injury, he is still entitled to benefits for that disability. An employee’s possible negligence includes being intoxicated or impaired by other substances, legal or illegal. Such conduct is not an issue in whether the benefits for the injury arising on the job are payable. Should such conduct be discovered before it causes injury, then termination or other discipline of the employee may be appropriate. However, we find no statutory support for allowing these considerations to deny disability benefits once an otherwise compensable injury has occurred.
A post-injury termination for misconduct, even if the misconduct contributed to the injury, does not end the right to benefits.
Job-site negligence that arises from illegal drug use may be especially likely to cause injuries. Yet every area of the law does not serve the same remedial purposes. The purposes of the statutes that we review in this appeal are to provide benefits for injuries suffered on the job. If workers’ compensation law is to become part of the vanguard against drug use by denying benefits to workers suffering otherwise compensable injuries, that is for the legislature to decide.
Id. at 1106-07 (¶¶ 14-16). In this case, the Commission correctly recognized section 71-3-7 and Hilliard as the controlling law, finding that, because Shores’s intoxication did not proximately cause his death, his intoxication in violation of employer policies did not bar his otherwise work-related death from compensability.
¶ 49. Having found that Shores’s death was in the course of his employment, the Commission concluded that Shores’s death arose out ,of his employment because the risk of assault and robbery was a street risk attendant to Shores’s employment as a truck driver. In reversing the Commission, the majority finds that assault and robbery are not special risks of employment as a truck driver. I defer to the majority’s general discussion of the positional risk doctrine and our relevant precedent, but disagree with the majority’s result. While recognizing that other states have applied the positional risk doctrine to truck drivers, the majority finds that “there is no evidence, and the appellee does not suggest, that a person is more likely to be robbed and assaulted at a truck stop than any other public place where large numbers of people interact.” Then, for fear of engaging in unfair stereotyping and generalizations about truck drivers, the majority refuses to hold that robbery and assault are inherent risks of employment as a truck driver.
¶ 50. The majority cites Hill City Trucking, Inc. v. Christian, 238 Va. 735, 385 S.E.2d 377, 380 (1989), for the proposition that truckers are not subject to an increased risk of robbery and assault. However, the Virginia Supreme Court in Hill City applied the stricter actual risk test to determine whether the injury arose out of the trucker’s employment. In Hill City, criminals, impersonating police, pulled over a truck driver and robbed and shot him. Applying the actual risk test, the court questioned whether the employment was a contributing proximate cause of the risk of robbery and assault on a trucker’s person. The court determined that it was not, and reversed the contrary finding of the court of appeals. The court of appeals had held that driving down dark roads, which was required by the employ *474 ment, increased the trucker’s risk of robbery and assault. The supreme court found that the court of appeals had erroneously applied the positional risk doctrine to find compensability. Since this Court applies the positional risk doctrine, I regard Hill City to be inapposite to this case and consider the question under the positional risk doctrine.
¶ 51. Discussing the positional risk doctrine, our supreme court has stated:
“It is not the peculiar nature of the environment or of the risk, provided it is accidental, but the fact that the work brings the worker within'the orbit of whatever dangers the environment affords that is important. It follows also that it is not necessary for the injury or the risk to be ‘natural,’ ‘normal,’ or predictable. When it is so, this fact, like ‘special danger,’ makes causal connection between work and injury more plain. But the very essence of compensation is that the injury be accidental, and that means unexpected.
... [N]o more is necessary than that the work subject the employee to a peril which comes from the fact that he is required to be in the place where it strikes when it does so.- It is immaterial whether the place is the employer’s premises or a street; whether the risk arises from physical features or human agencies connected with the place; whether it is a common occurrence or an extraordinary happening; one which threatens only employees at work or others also.[”]
Brookhaven Steam Laundry v. Watts, 214 Miss. 569, 603-04, 55 So.2d 381, 393 (Miss. 1951) (quoting Hartford Accident and Indemnity Co. v. Cardillo, 112 F.2d 11, 14 (D.C.Cir.1940)). The activities of a traveling employee are “not to be lifted from the perimeters of his employer’s mission and viewed in isolation, but must be viewed in ... context, as a whole.” Big “2” Engine Rebuilders, 379 So.2d at 891.
¶ 52. A long-haul truck driver’s employment requires the driver to traverse the country and to meet delivery deadlines. Yet, truckers are required to punctuate periods of driving with periods of rest. Truck stops are specifically designed to meet the needs of truck drivers. Conveniently located along the nation’s major highways, truck stops provide a trucker with expeditious access to trip necessities such as fuel, repairs and service; sustenance, restroom and shower facilities, ATM machines, shopping, and opportunities for rest and recreation. Thus, a long-haul truck driver’s presence at truck stops easily may be seen as being associated with the employment. Accordingly, in Special Fund of Industrial Commission v. Catalina Trucking Co., 134 Ariz. 585, 588, 658 P.2d 238, 241 (Ariz.Ct.App.1982), the court found that, for the purposes of the street risk doctrine, there was no meaningful distinction between a self-service truck stop premises and the street because the exposure to the hazards of the truck stop resulted from the demands of the trucker’s employment. The court further found that truck stops pose an increased hazard of assault. Quoting Hudson v. Thurston Motor Lines, Inc., 583 S.W.2d 597, 602 (Tenn. 1979) the court stated:
No one can quarrel with the conclusion that a truck driver for a motor freight carrier is exposed to the hazards of the streets and highways to a substantially greater extent than is common to the public. That is the basis for the street-risk rule, which simply stated, is that the risks of the street are the risks of the employment, if the employment requires the employee’s use of the street.
Id. at 589, 242.
¶ 53. I believe that a trucker’s risk of assault and robbery is increased by the *475 employment environment as one that “specially expose[s] the employee to lawless or irresponsible members of the public, ... or that merely subjects] the employee to increased and indiscriminate contact with the public.” Johnson v. Roundtree, 406 So.2d 810, 811 n. 1 (Miss.1981) (quoting 1 Larson’s Workmen’s Compensation Law, § 11.11(a) (1978)). There was evidence of the increased risks of harm to truck drivers at truck stops in this very case. Lynn Shores testified that Total had instructed its female drivers not to exit the truck at a truck stop after dark because truckers had been robbed at fuel islands. Lynn also stated that she had read an article in a trucker’s magazine warning that people had been “snatched” while walking between parked trailers. Viewing the matter more generally, a long-haul trucker’s job requires the trucker to spend time far away from home and to interact at truck stops with other itinerant strangers. In addition to hauling goods, truckers must carry their money and personal effects along with them on trips. Truckers may readily be found at truck stops. For these reasons, it is reasonably foreseeable for truckers such as Shores to be preyed upon at truck stops by opportunistic criminals. See Big “2” Engine Rebuilders, 379 So.2d at 891. Without apparent fear of stereotyping, our courts have acknowledged the reality that persons employed as streetcar conductors, bus drivers, taxi drivers, hotel managers, and convenience store workers are subject to increased risk of assault by virtue of their employment. I would apply the same reasoning to long-haul truck drivers such as Shores.
¶ 54. Under our Workers’ Compensation scheme, the Act must be “construed fairly to further its humanitarian aims” and “doubtful cases are to be resolved in favor of compensation.” Id. at 899. The Commission recognized and applied these principles in its decision that Shores’s death was compensable. I would affirm the decision of the circuit court affirming the Commission.
KING, C.J., SOUTHWICK AND IRVING, JJ„ JOIN THIS OPINION.