# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-WC-00402-COA

**WILLIE RAMBO**                                                          **APPELLANT**

**v.**

**KELLY NATURAL GAS PIPELINES, LLC AND**                          **APPELLEES**
**MIDWEST EMPLOYERS CASUALTY**
**COMPANY**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2023 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | STEVEN HISER FUNDERBURG |
| ATTORNEY FOR APPELLEES: | TRISTAN RUSSELL ARMER |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 03/12/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND GREENLEE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Willie Rambo appeals from the decision of the Mississippi Workers' Compensation Commission (MWCC), which denied him benefits because it held that the injuries he sustained in a motor vehicle accident were not work-related. On appeal, Rambo argues that he was entitled to benefits because he was a traveling employee of Kelly Natural Gas Pipelines LLC (Kelly) at the time of the injury, that any deviation from his employment was temporary, that he had returned to the course and scope of his duties at the time of the accident, and that he was engaged in a dual purpose that included his employer's purpose. Having considered the arguments of the parties and relevant precedent, we affirm the Commission's decision.

**Facts**

¶2.    In February 2020, Rambo was employed by Kelly, a company that replaced and installed natural gas pipelines in Mississippi and Alabama.  At the time, Rambo, who laid pipes and drove forklifts, was working on a three-man crew consisting of Rambo, Rashad Crowell, and their foreman, Juwan Payton.  They had been working for approximately six months on an assignment in Greenwood, Mississippi, one of three or four job sites Kelly operated at the time.

¶3.    Rambo lived in Bay Springs, Mississippi, with Victoria Jordan and their daughter.  During the week, Rambo stayed in Greenwood in a motel room paid for by Kelly.  This arrangement saved employees money on gas and travel costs and limited the risks of driving long distances on the highways.[1]  Kelly also issued Rambo and other employees debit cards on which Kelly advanced them a per diem for the next week.  Kelly would offset it the following week if the employees did not work a full week.

¶4.    Employees traveled to and from work either in their personal vehicle or, if an individual were a foreman or higher rank, in a company truck.  Kelly gave employees with assigned trucks fuel cards to pay for gas.  According to company policy, though, if an employee drove a company vehicle to and from work, he or she was not to use it for personal business, and it was to be parked when the employee was at home.[2]  Rambo did not own a personal vehicle but rode with his foreman, Payton, who also lived in Bay Springs and who

---

[1]  Rambo was not paid to drive to and from home.

[2]  Payton testified that often employees would carry scrap metal from the worksites home, which the company allowed.

had been assigned a company truck. But Rambo, rather than Payton, usually drove the truck.[3]

On Fridays, after dropping Payton and Crowell off,[4] Rambo parked the truck at his home for

the weekend. On Monday morning, he would pick up the rest of the crew and drive, in this

instance, to Greenwood to work. Jordan testified that others who worked at Kelly and lived

in Rambo's community, among them Fred Martin[5] and Larry Shelby, knew that Rambo drove

the company truck and parked it at his house. In addition, Payton's supervisor Larry Moore

testified that although the truck was issued to Payton, it did not matter who drove it as long

as that driver was authorized by Kelly, and Rambo was an authorized driver of Kelly's.[6]

> Q.     Correct. So it was no big deal, to your knowledge, if Willie Rambo
>         was driving a truck to the job site?
>
> A.     No.

¶5.     On Tuesday, February 18, 2020, it started to rain around noon. In such instances, the

supervisors would confer and determine how long the rain would last and communicate to

---

[3] Kelly was aware that Rambo drove a company truck to and from work because Rambo had previously "totaled" a truck to avoid an accident.

[4] Rambo dropped Payton off at his home in Bay Springs. He dropped Crowell off at a local gas station. Usually, Crowell drove himself to work, but his vehicle was not working, and he rode with Payton and Rambo at the time. Rambo would drop Crowell off at the gas station where Crowell's wife picked him up and took him to their home in a neighboring town.

[5] On weekends, Martin, who was Payton's supervisor, would stay with his parents in Bay Springs whose home was not too far from Rambo's house. Martin also had a home in Petal, Mississippi.

[6] Moore said that this was allowed in case the foreman got sleepy and needed a rest. Kelly also testified that company trucks were to be used only for work purposes—to get to and from the job site from the hotel and to get dinner.

the foremen whether to shut down work. According to Payton's supervisor Moore, a work stoppage could only be ordered by Carlos Ackles, who was Moore's supervisor at the time. Ackles would text the foremen and supervisors if work shut down. Fred Martin, who also was a supervisor, was working a crew between Canton and Meridian at the time. He confirmed this procedure and added that his crew could not leave the motel during the week unless they had permission from Ackles. Martin said that supervisors like himself, Ackles, and Moore would have no direct contact with site workers like Rambo, and anything communicated to Rambo about the job came from Rambo's foreman, Payton. Payton testified that he got the word of a "rain-out" on Tuesday around noon, and he and his crew returned to the motel.

¶6.     The vice president of Kelly, Jerry Kelly, said that even if there were an anticipated rain-out, often the company would re-direct employees to other work, which is why employees were to stay at the motel until given specific instructions. But there is no written policy requiring employees to stay in the motel rooms and not leave.[7] Jerry also said that employees were paid for two hours' work if they were away from home and no work was performed due to the rain-out.

¶7.     On Wednesday, February 19, 2019, it was still raining. Payton said he learned by either a text or a call from his supervisor that there would be another rain-out. When Payton

_____

[7] Kelly revealed that it did not have policies concerning other work-related issues, such as what time work began or ended, that all employees were to follow the instructions of their superior, and that employees were paid for two hours of work when rained out. But employees nonetheless knew these policies. Just like these policies, Kelly argued, employees knew that they were not to leave the motels to go home without authorization.

learned about the rain-out, he, Rambo, and Crowell left the worksite to go home.[8] Victoria Jordan said that it was common, specifically "a constant thing," for Rambo, Payton, and Crowell to come home when there was a rain-out. Payton confirmed that he and Rambo would sometimes go home during the week. Payton said there was no written rule requiring them to stay at the motel if it was raining. However, Payton also testified that his supervisor, Moore, had previously said that the company was paying for the motel, and the company wanted them to stay there even on rain-out days. Payton also testified that no one knew that he, Rambo, and Crowell had left, and Payton admitted that he was not handling any company business when he traveled home. Payton said that it was his idea to go home to Bay Springs and Rambo and Crowell agreed.

¶8.     The next day, Thursday, February 20, 2020, Rambo left Bay Springs at 4:00 a.m. to make it back to Greenwood by the start of the workday at 7:00 a.m. He picked up Payton and Crowell to ride back with him.[9] At 5:00 a.m., Rambo was involved in an accident in which the driver of the other vehicle was killed. Rambo reported the accident, and Moore picked him up and took him for drug testing, which was negative. Rambo and Moore drove back to Greenwood, and Rambo checked out of the motel because the worksite was rained out. They returned to Canton, where Moore took Rambo for alcohol testing and got him a room. They also called the company hotline to officially report the accident. Moore said that he

---

[8] Crowell, who also lived in Bay Springs, had wrecked his vehicle and was riding with Rambo and Payton.

[9] Payton also testified that they had carried scrap metal home and that Rambo had unloaded it before picking them up.

heard Rambo say that he had not been injured. Rambo worked at the Canton worksite on Friday, February 21, 2020.

¶9. On Monday, February 24, 2020, Jordan and Rambo's mother drove Rambo to Meridian to attend a disciplinary meeting with Payton and Supervisors Ackles, Moore and Martin. Moore and Martin both testified that Rambo said he knew the policy of not leaving the motel without permission. Moore also said that during the meeting, Rambo said he felt fine. According to Moore, Rambo was not reprimanded because Payton was "the one held responsible for that truck going home." Rambo was given a few days off if he needed to recover. At that same disciplinary meeting, Kelly fired Payton because he was not authorized to drive home.[10]

¶10. The same day as the meeting, February 24, 2020, Rambo went to the Bay Springs Medical Clinic complaining of lower back pain. He returned to the clinic on February 26, 2020, and again on February 27, still complaining of back pain and now foot numbness. The clinic's records reflect that he was being treated for a worker's compensation injury. He was sent for X-rays and an MRI. Ultimately, he was treated by Dr. Orhan Ilercil of Mississippi Brain & Spine. Rambo did not return to work, and having no further communication with him, on March 25, 2020, Kelly terminated Rambo's employment.

¶11. Prior to his termination, Rambo applied for worker's compensation benefits, which Kelly's carrier Midwest Employers Casualty Company denied. On March 19, 2020, Rambo

---

[10] Payton testified that he did not know why they let him go. Interestingly, Kelly rehired Payton in April 2020, although he later was terminated for insubordination for refusing to appear for a COVID test.

filed a petition to controvert with the MWCC. In response to the petition and among other things, Kelly and Midwest denied that Rambo sustained an injury, denied there was an employer/employee relationship at the time of the injury, and denied that Rambo was performing a service for Kelly or acting within the course and scope of his employment when the accident occurred.

¶12. According to Jordan, Rambo's neck and lower back hurt every day after the accident. On September 12, 2020, Rambo underwent a surgical procedure. Although he was sitting up and talking after the surgery, according to Jordan, that night Rambo "coded" and had to be revived. He was in a coma for a month and now cannot walk or talk.

¶13. Meanwhile the worker's compensation case proceeded. The parties engaged in discovery, and a hearing was held before an MWCC administrative judge (AJ) on August 19, 2022. The AJ identified the main issue as "whether or not a work-related accident occurred on February 20, 2020, injuring Rambo's whole body." Sub-issues included whether the accident occurred in the course and scope of Rambo's employment and whether Rambo had deviated from employment at the time.

¶14. At the hearing, Jordan testified that Rambo frequently came home on rain-out days and that he drove a company truck each time. He parked it in the yard and used it to go only to and from work. Payton testified by deposition, while Moore, Martin, and Jerry Kelly gave live testimony to the facts noted above. Rambo's personnel file and medical records were entered into evidence. Rambo was unable to testify due to his disabilities.

¶15. In its December 29, 2022 decision, the AJ recounted the substance of the testimony

7

and the documentary evidence in the record and concluded that there was no dispute that the accident occurred as Rambo, Payton, and Crowell were returning to work from their mid-week visit home. The AJ noted that they did not have permission to make the trip, and the AJ concluded that they either detoured or deviated from their work duties "and/or that the accident did not arise out of or in the course of their employment."

¶16. The AJ further determined that Rambo was a traveling employee but noted that being a traveling employee did not make all travel accidents compensable. She noted that if an injured employee deviated from his usual course of employment, the injuries were not compensable. The AJ cited several cases that denied compensation to employees who had abandoned their duties of employment and gone on personal missions when the injury occurred. Although Kelly had no written company policy prohibiting Rambo and others from leaving the work site, the AJ determined that their trip home was for a purely personal reason. The AJ found that Rambo was a traveling employee who deviated from his course of employment by going home mid-week. Therefore, the AJ denied Rambo benefits.

¶17. On January 3, 2023, Rambo petitioned the full Commission to review and reverse the AJ's decision because, he contended, he was following his supervisor's instructions at the time of the accident. The Commission considered Rambo's petition for review and issued its ruling on March 27, 2023. In a 2-1 decision, two Commissioners (Mark Formby and Mark Henry) affirmed the AJ's ruling, following what they considered direct precedent from the Mississippi Supreme Court in *Phillips Contracting Co. v. Dependents of Adair*, 245 Miss. 365, 148 So. 2d 189 (1963). However, despite affirming, Commissioner Henry wrote a

8

separate concurrence, questioning the correctness of the *Phillips* decision. The dissenting Commissioner (Beth Harkins) disagreed because she concluded that Rambo was following the orders of his direct supervisor and had not deviated from his employment. Commissioner Harkins pointed out that Rambo had not been disciplined and was told to return to work the very same day of his injury. She noted that Rambo regularly drove the company vehicle to and from work, that Kelly had no explicit policy about midweek trips home, and that any deviation was temporary in nature because Rambo was driving back to work when the accident occurred.

¶18. On April 3, 2023, Rambo appealed the Commission's order. He argues that (1) he was a traveling employee acting in the course and scope of his employment at the time of the accident; (2) he did not deviate from or abandon his employment at the time of the accident, or that any deviation was temporary and that he had returned to the course and scope of his employment at the time of his injuries; and (3) in the alternative, he was engaged in a dual purpose that included his employer's purpose at the time of the accident.

**Standard of Review**

¶19. "The standard of review in worker's compensation cases is limited by the substantial evidence test." *Chambers v. Howard Indus. Inc.*, 310 So. 3d 833, 835 (¶6) (Miss. Ct. App. 2021) (citing *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 489 (¶11) (Miss. Ct. App. 2004)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and affords a substantial basis of fact from which the fact in issue can be reasonably inferred." *Myrick v. Univ. of Miss. Med. Ctr.*, 358 So. 3d

9

1109, 1113-14 (¶13) (Miss. Ct. App. 2023) (internal quotation marks omitted); *accord Sims v. Delta Fuel*, 308 So. 3d 859, 863 (¶15) (Miss. Ct. App. 2020). "We may not reweigh the evidence that was before the Commission." *Burton v. Nissan N. Am.*, 305 So. 3d 1163, 1169 (¶18) (Miss. Ct. App. 2020) (quoting *Wright v. Turan-Foley Motors Inc.*, 269 So. 3d 160, 167 (¶26) (Miss. Ct. App. 2018)). "If the Commission's order is supported by substantial evidence, this Court is bound by the Commission's determination, even if the evidence would convince us otherwise if we were the fact-finder." *Forrest Gen. Hosp. v. Humphrey*, 136 So. 3d 468, 471 (¶14) (Miss. Ct. App. 2014). "This Court will not reverse the Commission's decision unless we find that it is clearly erroneous and contrary to the overwhelming weight of the evidence." *Chambers*, 310 So. 3d at 835 (¶7).

¶20.    However, "we review the Commission's application of the law de novo." *Id*. (citing *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 475-76 (¶9) (Miss. 2011)). "The legal effect of the evidence, and the ultimate conclusions drawn by the Commission from the facts are questions of law, especially where the facts are undisputed or the overwhelming evidence reflects them." *Gregg*, 64 So. 3d at 475-76 (¶9).

**Discussion**

¶21.    Although Rambo agrees with the AJ that he was a traveling employee, he disagrees with the AJ and the Commission on his non-entitlement to worker's compensation benefits. Rambo contends that Kelly had not shown that he had completely abandoned his employment duties at the time of the accident and had undertaken an unauthorized personal mission. In the alternative, he argues that he had returned to his employment duties when he was

10

transporting himself and co-workers back to the worksite, making his trip a dual-purpose trip.

### I. Whether Rambo was a traveling employee in general.

¶22. A "traveling employee" is an employee whose work takes him away from the employer's premises." *Sims*, 308 So. 3d at 863-64 (¶18). This includes the employee "who goes on a trip to further the business interests of his or her employer such as a traveling salesman[,] or a person attending a business conference for the benefit of his employer," or "an employee for whom travel is an integral part of their job." *Lambert v. Energy Drilling Co.*, 313 So. 3d 518, 522 (¶10) (Miss. Ct. App. 2021).

¶23. This category of employee may be exempt from the "going and coming" rule, which deems injuries incurred while in transit to or from a job as noncompensable under the Workers' Compensation Act. *Bouldin v. Miss. Dep't of Health*, 1 So. 3d 890, 895 (¶10) (Miss. Ct. App. 2008); *Lambert*, 313 So. 3d at 522 (¶10). We have pointed out that "[m]erely commuting out of town for work does not make an employee a 'traveling employee' for workers' compensation purposes." *Lambert*, at 522 (¶11). For example, in *King v. Norrell Servs. Inc.*, 820 So. 2d 692, 695 (¶1) (Miss. Ct. App. 2000), we affirmed the denial of workers' compensation benefits to a temporary employee living in Batesville, Mississippi, who was injured while driving home from her job in Oxford.

¶24. However, there are six exceptions to this "going and coming" bar to compensation, one of which is when the employer furnishes the means of transportation or compensates the employee for travel costs. *King*, 820 So. 2d at 695 (¶19).[11] For example, in *Dixie Products*

---

[11] The other exceptions include (2) where the employee performs some duty in connection with his employment at home; or (3) where the employee is injured by some

11

*Co. v. Dillard*, 770 So. 2d 965, 968 (¶¶8-9) (Miss. Ct. App. 2000), we held that the van Dillard drove was used in his work with several family businesses and was provided to him by Dixie Products to get to and from work, taking him out of the "going and coming rule." In *Gas v. Edmonds*, 167 So. 3d 1258, 1263 (¶20) (Miss. Ct. App. 2014), we stated:

> The law is clear that the employer-provided-transportation exception to the "going and coming" rule allows an employer to assume responsibility for the employee's travel either by paying the transportation costs or by providing a "company vehicle." See *Hurdle & Son* [*v. Holloway*], 749 So. 2d [342], 348 (¶16) [(Miss. Ct. App. 1999)].

¶25. In the case at hand, Kelly furnished a vehicle to Payton and authorized him to use it to drive home from worksites. Reinforcing this permissive behavior, Kelly had several written policies that required the authorized person to park company-issued vehicles over the weekend and not use them without permission. Thus, Kelly anticipated that Payton would be driving it back and forth to work. At the time of the accident, Payton was in his company-issued truck, albeit as a passenger. Rambo was authorized to drive Kelly vehicles and Kelly supervisors living or visiting Bay Springs on the weekends knew the truck was parked on Rambo's property. Accordingly, Kelly had furnished the means of transportation, Rambo qualified to be considered as a "traveling employee." However, to be eligible for workers' compensation benefits for the accident at issue, Rambo must also show that at the time, he was acting in the course and scope of his employment and not on a personal mission, even

---

hazard or danger that is inherent in the conditions along the route necessarily used by the employee; or (4) where the employer furnishes a hazardous route or (5) where the injury results from a hazardous parking lot furnished by the employer; or (6) where the place of injury, although owned by one other than the employer, is in such close proximity to the premises owned by the employer as to be, in effect, a part of such premises. *King*, 820 So. 2d at 695 (¶19).

12

if he were considered a "traveling employee."

## II. Whether Rambo was acting in the course and scope of his employment at the time of the accident.

¶26. "An injury is only compensable under the [Workers' Compensation] Act if it occurs in the course and scope of employment." *Sims*, 308 So. 3d at 864 (¶18) (citing Miss. Code Ann. § 71-3-3(b) (Rev. 2011)). An employee bears the burden of proving not only that an exception to the "going and coming" rule applies but that his injuries arose out of and in the course of his employment as well. *Stepney v. Ingalls Shipbuilding Div., Litton Sys. Inc.*, 416 So. 2d 963, 966 (Miss. 1982). The employee must show that the injury results in the course of an activity that "carries out the employer's purposes or advances his interests directly or indirectly." *Id.*

> An injury that occurs during a period of distinct abandonment of the employer's business is not compensable, and this is true for the traveling employee as well as the worker in a fixed place of employment. If a worker turns completely aside from his or her employer's business to engage in personal activities, he or she has deviated from the course of the employment.

John R. Bradley & Linda A Thompson, *Mississippi Workers' Compensation* § 4:28 (2020 ed.). "The employer has the duty to prove that the employee has abandoned his duties of employment and gone on a personal mission unrelated to his employment in order for the 'going and coming' rule to be a bar to compensation." *Gas*, 167 So. 3d at 1264 (¶23).

¶27. The Mississippi Supreme Court has held that even a traveling employee may forfeit compensation benefits if his injury occurs at a time he has abandoned his employment duties to undertake a personal mission. In a case nearly directly on point, *Phillips*, our supreme court held that the employer-sponsored-travel exception to the "going and coming" rule did

not apply because Adair had left work on an unauthorized mid-week trip home. *Phillips*, 148 So. 2d at 190. There, Adair, a resident of Columbus, Mississippi, was working at a job site in Kosciusko. *Id.* at 189. He drove his personal vehicle to work on Monday and returned home in it on Saturday. *Id.* During the week, Adair and other employees often drove a company vehicle home to visit family. *Id.* Although the president of the company knew employees might leave to go home, he neither approved nor disapproved of this behavior. *Id.* However, using the company vehicle for this purpose was contrary to the employer's policies. *Id.* at 190. The mid-week trips were "solely for the personal pleasure of the employees." *Id.* On one of these Wednesday trips, Adair was headed to pick up a co-worker for them to return to the worksite, when he realized he had forgotten his false teeth. *Id.* On his way home, he met with a fatal accident. *Id.* The supreme court held that Adair's trip home was purely personal, that his employer had no interest in its employees going home mid-week, and that Adair's death did not arise out of or in the course of his employment. *Id.* Accordingly, the supreme court reinstated the Commission's order denying benefits. *Id.*

¶28. Despite some factual differences between this case and *Phillips*, ultimately *Phillips*' holding is still applicable. Although Kelly specifically provided transportation to Payton to drive to and from work unlike the employer in *Phillips*, here Kelly prohibited employees from leaving the motels without permission. There was testimony that Payton, Rambo, and Crowell knew this but nonetheless, all left work on an unauthorized, purely personal mission. In this case, as in *Phillips*, Kelly (Rambo's employer) derived no benefit from having its employees leave the worksite mid-week.

¶29.    Rambo argues, and the dissent agrees, that he is entitled to benefits because he was just "following the instructions of his superior."  But neither provides any precedent to support an employee's entitlement to workers' compensation benefits despite the employee's knowing disregard for his employer's policies on this basis. More importantly, Rambo provided no evidence that Payton had in fact ordered or instructed him to leave the motel and go home.  Rambo did that of his own free will.  Payton did not specifically answer the question when asked if he directed Rambo to leave:

> Q.    When you left Greenwood that day because you said there had been a rainout, did you tell Mr. Rambo that there had been a rainout and, "Go get the truck," or, "Pack your stuff"? How did that happen?
>
> A.    Well, we was in the room the first day well, the first evening it rained out. The next day, it rained out and we came home. But the next morning when we was headed back to work, it was still raining. So they called another rainout and the accident happened.
>
> . . . .
>
> Q.    How did the conversation between you, Willie, and Rashard occur that y'all were leaving to go back home to Bay Springs?
>
> A.    Well, we was sitting there. And when we looked at it, it was going to rain the next day, so we got up and left and went home.

It seems that all three agreed to leave the worksite and that leaving was not a directive from Payton, the supervisor.

¶30.    The dissent would consider Rambo's trip home as a mere deviation for a personal mission and that he was still entitled to benefits because the accident occurred on his drive to work.  We recognize that there have been cases where an employee may still be entitled to workers' compensation benefits when he only temporarily deviated from his business

15

mission such as *Thrash v. Jackson Auto Sales*, 232 Miss. 845, 100 So. 2d 574 (1958). In that case an automobile salesman had left his home one evening to meet with a prospective buyer for the dealership vehicle he was driving. *Id.* at 576. The buyer testified that Thrash and he test-drove the car and then stopped at a club and socialized with some of Thrash's friends. *Id*. Then, while Thrash was driving the vehicle home, he crashed into a power pole and was killed. *Id*. In considering Thrash's family's appeal of the denial of workers' compensation benefits, the Mississippi Supreme Court found:

> [T]he deceased initially entered upon a business mission in the course of his employment and temporarily deviated therefrom to engage in a personal mission, and upon completion of his personal mission, he resumed his direct business route to his home and was in the course of his employment when he was killed.

*Id*. at 578. The supreme court cited a case with substantially similar facts, *Retail Credit Co. v. Coleman*, 227 Miss. 791, 86 So. 2d 666 (1956). In both *Thrash* and *Coleman*, the employees were on their way home from undertaking a mission for their employers and their deviations for personal reasons were for merely a few hours. In Rambo's case, he did not leave the motel to do anything for his employer; in fact, he knew his employer had instructed the workers to stay at the hotel and not leave. Moreover, Rambo's alleged "deviation" was not for a few hours; it was for more than a day. Thus, Rambo was not nonetheless entitled to benefits because he was merely deviating from a mission for his employer to undertake a personal mission.

¶31. Nor did Rambo "return to his employment duties" just because he picked up his co-workers and started driving back to work prior to the accident. In *Phillips*, Adair was also

16

in the process of picking up co-workers to return to work when his accident occurred, but this did not convince the supreme court to find that he had merely temporarily deviated from his job duties and returned to them when he was killed. *Phillips*, 148 So. 2d at 190. The supreme court viewed the entire trip—leaving the worksite and returning—as Adair's personal mission, making no distinction as does the dissent between Adair's overall trip home, and his detour on his return to get his false teeth. *Id.* Similarly, in this case, Rambo left work to go home mid-week and was returning when his accident occurred. The entire trip was a personal mission. It is also illogical to say that when an employee leaves work without permission on a personal mission, he is not acting in the scope of his employment, but then say that when he chooses to return, he is. In *Bouldin*, this Court held that even an injury sustained while an employee was returning to work from her lunch break was not compensable. *Bouldin*, 1 So. 3d at 896 (¶15).[12] Similarly, Rambo's injury occurred while he was returning to work from a personal break he took during the rain-out. Although an injury sustained on other trips to and from Kelly's worksite might have been covered, this one was not.

¶32. In *Sims*, we addressed the "dual purpose test" for employee travel. We stated:

> In *E & M Motel Management Inc. v. Knight*, 231 So. 2d 179, 182-83 (Miss. 1970), the Mississippi Supreme Court articulated the test for compensability when an employee's travel has a dual purpose (the "dual-purpose test"), as follows:

---

[12] In that case Bouldin was hit by a vehicle while crossing a public street during her lunch break. 1 So. 3d at 893 (¶1). We pointed out that she was not paid for time spent on her lunch break. *Id.* at 896 (¶16). Nothing in her job duties required her to take a walk, and she was not on a dual mission for both herself and the employer when the accident occurred. *Id.*

17

> If the work of the employee creates a necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk.

*Sims*, 308 So. 3d at 864 (¶19). Noteworthy in this definition is the principle that the travel that caused the injury was necessary for or required by an employee's work. Even Rambo recognizes this requirement in the cases he cites. In *E & M Motel*, 231 So. 2d at 183, a hotel manager, who was on duty at all times, traveled home to Tupelo from a conference in Memphis by going through Corinth so he could both visit his granddaughter and check on signage for a new motel. The supreme court cited a treatise, stating, "If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own." *Id*. (quoting Vardaman S. Dunn, *Mississippi Workmen's Compensation*, §183 at 246 (2d ed. 1967)). In that case, the manager's check of the future hotel's signage was within the scope of his duties, which entitled him to workers' compensation benefits. In this case, there was no need for Rambo to leave the worksite mid-week, so his travel was not necessitated by his work.

¶33. In *Sims*, 308 So. 3d at 862 (¶¶8-9), the claimant argued that his motor vehicle accident arose out of and occurred during the course of his employment because he brought his brother a copy of his company's product list (business reason) when delivering a four-wheeler (personal reason) to his brother's deer hunting camp. But Sims knew his brother would not be there at the time and his brother testified that Sims had not mentioned a product

18

list to him. *Id*. In rejecting Sims's dual purpose argument, we held that the AJ's determination denying benefits was supported by substantial evidence.[13] *Id*. at 866 (¶22). We also noted that "[a]bsent the personal mission of delivering the four-wheeler, the business mission would not have placed [Sims] south of his previous sales call on Highway 469 when the motor vehicle accident occurred. *Id*. (¶25). Similarly, in this case, absent Rambo's personal mission of going home mid-week, circumstances would not have had him at the scene of his accident on Thursday morning. Nor does picking up co-workers to return to work from their collective personal mission of returning home mid-week make Rambo's travel in the course of his employment duties. There would have been no need for a return to work, had there not been an unauthorized leaving by Rambo and his co-workers in the first place. Nor did Rambo articulate any other employer-related purpose.[14] In this case, Rambo was not on a dual-purpose mission that would entitle him to workers' compensation benefits for his injuries.

**Conclusion**

¶34. The evidence in this case substantially supports the Commission's order. Although Rambo may have been a traveling employee, on the day in question he was returning to work

---

[13] Sims also argued that he had to go by his home office in Crystal Springs, in the vicinity of his brother's property, to get a form he needed for his final sales call in Jackson, Mississippi, making the delivery of the four-wheeler a slight temporary deviation. *Sims*, 308 So. 3d at 862 (¶9) The AJ and this Court rejected this argument because Sims had a truck equipped with a computer and printer with which he could have printed out the form he needed, making a stop to his home office unnecessary. *Id*. at 866 (¶24).

[14] *See also Lambert v. Energy Drilling Co.*, 313 So. 3d 518, 525 (¶19) (Miss. Ct. App. 2021) ("Lambert was not acting in the course and scope of his employment when he was transporting his personal tools to and from the worksite.").

19

from a purely personal mission—an unauthorized mid-week trip home. Because of its personal nature, under these circumstances Rambo's return to work was not in the course and scope of his employment duties, nor did his travel serve a dual purpose. Consequently, the injuries he suffered from the automobile accident are not compensable under the Mississippi Workers' Compensation Act.

¶35. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS AND EMFINGER, JJ., CONCUR. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LAWRENCE, McCARTY AND SMITH, JJ.**

**CARLTON, P.J., DISSENTING:**

¶36. I agree with the majority's finding that based on the facts of this case, Rambo met his burden of proving that he qualified as a traveling employee. However, I disagree with the majority's finding that Rambo failed to show he was acting in the course and scope of the employment at the time of the accident. I submit that the record shows Rambo was acting in the course and scope of his employment at the time of the accident, and therefore he sustained a compensable, work-related injury. As a result, I respectfully dissent from the majority's opinion affirming the Commission's denial of benefits.

¶37. This Court has recognized that "[a]n injury is only compensable under the [Workers Compensation] Act if it occurs in the course and scope of employment." *Sims v. Delta Fuel*, 308 So. 3d 859, 864 (¶18) (Miss. Ct. App. 2020) (citing Miss. Code Ann. § 71-3-3(b) (Rev. 2011)). In this case, both the Commission and the majority agree that Rambo proved that he qualifies as a traveling employee. "A traveling employee is held to be within the course of

20

his employment continuously during the trip, except when a distinct departure on a personal errand is shown." *Lane v. Hartson-Kennedy Cabinet Top Co.*, 981 So. 2d 1063, 1068 (¶12) (Miss. Ct. App. 2008) (internal quotation marks omitted) (quoting *Smith & Johnson Inc. v. Eubanks*, 374 So. 2d 235, 237 (Miss. 1979)). When a traveling employee "engages in a personal activity or errand that constitutes an abandonment from the employer's business, an injury occurring during the abandonment is not compensable." *Bouldin v. Miss. Dep't of Health*, 1 So. 3d 890, 896 (¶15) (Miss. Ct. App. 2008). "If an employee turns aside from the employer's business, the employee has deviated from the course of employment, unless the deviation is so slight as to be considered insubstantial." *Id*. Kelly Gas, as the employer, "has the duty to prove that [Rambo] has abandoned his duties of employment and gone on a personal mission unrelated to his employment[.]" *Gas v. Edmonds*, 167 So. 3d 1258, 1264 (¶23) (Miss. Ct. App. 2014); *accord Eagle Motor Lines v. Mitchell*, 223 Miss. 398, 409, 78 So. 2d 482, 485 (1955).

¶38. The record in this case shows that Rambo was acting in the course and scope of his employment at the time of the accident. Furthermore, any possible deviation from his employment was temporary in nature and, therefore, "insubstantial." *Bouldin*, 1 So. 3d at 896 (¶15). In his deposition, Payton, Rambo's immediate supervisor, admitted that it was Payton's idea to leave the hotel where the employees were staying that week and drive home for the night. Jerry Kelly, one of the owners of Kelly Gas, testified that Payton was Rambo's immediate supervisor, which meant that Rambo answered to Payton. Kelly also testified that Payton's employment was terminated for leaving the work site without permission, but

21

Rambo was not terminated or disciplined. Kelly explained that this decision was based on the fact that Payton—not Rambo—"was the one responsible for the vehicle and responsible for the crew and what they were supposed to do . . . ." As for his decision to leave the hotel, Payton testified that Kelly Gas did not have a written policy prohibiting employees from leaving the hotel at an out-of-town job site and traveling back home. Kelly confirmed that no such written policy existed. Both Payton and Larry Moore, Payton's direct supervisor, also testified that although the company truck was assigned to Payton, Kelly Gas authorized Rambo to drive the truck.

¶39. Based on the record, I find Rambo did not abandon the course and scope of his employment; rather, Rambo was following the instructions of his direct supervisor when he drove home from the work site and then returned the following morning. Any deviation Rambo engaged in was temporary and insubstantial in nature, and I find that at the very least, he returned to the course of his employment as he drove to the work site on the morning of the accident. *See Thrash v. Jackson Auto Sales Inc*., 232 Miss. 845, 852, 100 So. 2d 574, 577 (1958) ("It is well settled . . . that if a servant while engaged about his master's business deviates therefrom to engage in some personal errand or mission, the master's responsibility may be temporarily suspended but it is re-established when the servant resumes his duty.").

¶40. In finding that Rambo's injuries are not compensable, the majority relies on *Phillips Contracting Co. v. Dependents of Adair*, 245 Miss. 365, 148 So. 2d 189 (1963). In that case, the employee Adair left his job site mid-week without authorization and drove a company vehicle home to visit family. *Id*. at 189-90. The next morning, Adair drove the company

22

vehicle to pick up a co-worker so they could return to the job site. *Id*. at 190. On the way to pick up his co-worker, Adair realized he had forgotten his false teeth. *Id*. While driving back to his house to retrieve his teeth, Adair was killed in an automobile accident. *Id*. Upon review, the Mississippi Supreme Court held that the Commission properly denied Adair's dependents' claim for death benefits under the Workers' Compensation Act. *Id*. The supreme court found that Adair's death did not arise out of the course and scope of his employment because Adair's trip home was purely personal. *Id*.

¶41. However, I find that the case before us is factually distinguishable from *Adair*. Here, the record shows that Rambo was following the instructions of his immediate supervisor in driving the company vehicle home for the evening and returning to the job site the next day. Additionally, the claimant in Adair was killed while traveling to his house to retrieve his false teeth; in the present case, Rambo was injured while driving directly toward the work site.

¶42. After my review, I find that the evidence in the record shows that Rambo was in the course and scope of his employment at the time of his injury. Accordingly, I would reverse and remand this case back to the Commission for a determination of benefits. I therefore respectfully dissent.

**LAWRENCE, McCARTY AND SMITH, JJ., JOIN THIS OPINION.**